UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERTO VELEZ, *et al.*,<br>    *Plaintiffs*,<br>    *v.*<br>NEW HAVEN BUS SERVICE, INC., *et al.*,<br>    *Defendants*. | Civil No. 3:13cv19 (JBA)<br><br>August 4, 2014 |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Roberto Velez, Zacharie Porcenat, Jaime Garcia, Nadine King, James Earl Ebron, Matias Cabrera, David Pearson, Luis Alicea, Jose Logan, Kenneth Thomas, Dwayne Clark, Juan Coba, and William Crespo[1] bring this action against Defendants New Haven Bus Service, Inc ("NHBS"), Daniel Miley, and Yale University ("Yale") alleging that Defendants failed to pay them overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 (Count One) and the Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. § 31-72 (Count Two), and that Defendants failed to pay them all of the wages that they were owed, as required by Conn. Gen. Stat. § 31-71b, *et seq.* (Count Three).  (*See* 2d Am. Compl. [Doc. # 53].)[2]  Defendant Yale now moves [Doc. # 56] for summary judgment, arguing that Plaintiffs have failed to establish that Yale is their joint employer within the meaning of the FLSA and the CMWA, and that Plaintiffs' claims are barred by the motor carrier exemption and the statute of limitations.  For the following reasons, Yale's motion for summary judgment is granted.

---

[1] Debra King was initially a plaintiff in this action, but she voluntarily withdrew all of her claims against Defendants.  (*See* Mot. to Dismiss [Doc. # 92].)

[2] On July 29, 2014, the parties filed a stipulation of dismissal [Doc. # 95] with respect to the claims against Defendants NHBS and Miley, and therefore, only Plaintiffs' claims against Yale remain pending in this suit.

I.      **Background**[3]

     A.      **New Haven Bus Service and Daniel Miley**

Since 1978, Defendant NHBS has provided private bus transportation, "including coaches, shuttle buses, school buses and vans," in Connecticut and the surrounding area. (Miley Aff., Ex. A to NHBS's Loc. R. 56(a)1 Stmt. [Doc. # 57-28] ¶ 2.)  Defendant Miley serves as NHBS's President.  (*Id.*)   NHBS has an Interstate Commerce Commission Certificate of Public Convenience and Necessity to engage in interstate transportation. (ICC Certificate, Ex. B to NHBS's 56(a)1 Stmt.)  As required by the Federal Motor Carrier Safety Act ("FMCSA"), during the relevant time period for this lawsuit, NHBS filed its biannual Motor Carrier Identification Report with the United States Department of Transportation certifying its authority to provide services as an interstate carrier.  (*See* 2010 Motor Carrier Identification Report, Ex. D to NHBS's 56(a)1 Stmt; 2012 Motor Carrier Identification Report, Ex. F to NHBS's 56(a) 1 Stmt.)  These reports indicate that NHBS is an interstate carrier with interstate drivers.  (2010 Motor Carrier Identification Report; 2012 Motor Carrier Identification Report.)

     NHBS claims to have maintained driver records for most of the plaintiffs in this action, as required by the FMCSA (Miley Aff. ¶ 11; Driver Qualification Cover Letters, Ex. G to NHBS's 56(a)1 Stmt.)  In accordance with federal and state regulations, each of NHBS's drivers was required to have a valid Connecticut commercial driver's license ("CDL") and a valid Connecticut public service license, and was required to undergo pre-offer drug screenings and driving record checks.  (Miley Aff. ¶ 12.)  NHBS claims that it

---

[3] Because Yale incorporates by reference NHBS's arguments with respect to the statute of limitations and the motor carrier exemption, the background section relies on the record submitted in connection with NHBS's motion for summary judgment, as well as the record submitted in connection with Yale's motion for summary judgment.

provides all of its new drivers with a copy of its Driver Employment & Conduct Manual and the Federal Motor Carrier Safety Regulations.  (*Id.* ¶¶ 13, 15.)  NHBS has produced signed receipts from Plaintiffs Velez, Garcia, King, Thomas, and Coba for the manual (*see* Manual Receipts, Ex. I to NHBS's 56(a)1 Stmt.), and from Plaintiffs King, Porcenat, Garcia, Crespo, Velez, Coba, Thomas, and Ebron for the safety regulations (*see* Safety Regulations Receipts, Ex. J to NHBS's 56(a)1 Stmt.).  NHBS claims that all of its drivers are treated as a single pool, and can be assigned to drive any route, whether interstate or intrastate, because NHBS ensured that each of its drivers was properly certified for interstate travel.  (Miley Aff. ¶ 16.)

At the time of the alleged violations at issue in this lawsuit, Yale was NHBS's largest customer.  (*Id.* ¶ 17.)  NHBS had a contract with Yale between the 1980s and June 30, 2011 to provide interstate and intrastate bus service, including operating the Yale University shuttle service in New Haven, Connecticut.  (*Id.*)  NHBS's contract also covered the provision of charter bus service in Connecticut and its surrounding states, such as transporting students, alumni, and faculty to the Yale Club in New York City, to airports in New York and New Jersey, and to Yale's compound in Newport, Rhode Island. (*Id.* ¶ 18.)  Prior to 2005, NHBS derived roughly 50% of its revenue from interstate charter work, but with the expansion of the Yale shuttle bus service, Yale's business accounted for approximately 70% of NHBS's revenue by 2010.  (*Id.* ¶ 20.)  The expansion of the Yale shuttle bus service also prompted NHBS to assign drivers to the Yale shuttle each week, and drivers were frequently assigned to a route on a recurring basis.  (*Id.*)  In 2010 and 2011, there were thirteen local shuttle routes with both day and night shifts, such that NHBS had to cover twenty-six local runs each day for Yale.  (*Id.* ¶ 22.)

NHBS also had contracts with the Foote School and the Hopkins School to provide charter bus service to events in Connecticut, New York, and Massachusetts. (*Id.* ¶ 23.) NHBS's contracts with Yale, the Foote School, and the Hopkins School anticipated that NHBS would be able to cover all of its customers' transportation needs, including interstate travel. (*Id.* ¶ 24.) In 2010, interstate travel accounted for approximately 1% of NHBS's revenue, and in 2011, interstate travel accounted for approximately 1.5% of NHBS's revenue. (*Id.* ¶¶ 25–26; 2010 Financial Stmt., Ex. M to NHBS's 56(a)1 Stmt.; 2011 Financial Stmt., Ex. N to NHBS's 56(a)1 Stmt.) NHBS advertised for and solicited interstate charter work and in addition to providing transportation services for its regular customers, it would also take private groups out of state for special events. (Miley Aff. ¶ 27.)

NHBS was audited by the United States Department of Labor ("US DOL") and the Connecticut Department of Labor Wage and Workplace Standards Division (CT DOL") on at least four occasions in 2002, 2008, 2010 and 2011 and was found to be exempt from paying overtime to its drivers who possessed CDLs pursuant to the motor carrier exemption. (*Id.* ¶ 28.) For example, the 2002 audit by the US DOL concluded that NHBS drivers who held CDLs and could be called upon to drive out of state were properly declared exempt under the motor carrier exemption. (2002 Audit Report, Ex. O to NHBS's 56(a)1 Stmt at 5.) In the context of this audit, Plaintiffs Alicea, Velez, and Crespo were determined to be exempt under the motor carrier exemption. (*Id.* at 3–4.)

In 2008, the CT DOL investigated NHBS with respect to a complaint by Plaintiff Thomas. (*See* 2008 Investigation Letter, Ex. P to NHBS's 56(a)1 Stmt.) NHBS never received the final report with respect to this investigation but was not notified of any findings that it had violated the CMWA. (Miley Aff. ¶ 33.) In 2010, the CT DOL again

4

audited NHBS for the period of May 4, 2008 to April 10, 2010 and found that NHBS had properly claimed the motor carrier exemption and was in compliance with the CMWA. (2010 Investigation Ltr., Ex. Q to NHBS's 56(a)1 Stmt.; 2010 Audit Report, Ex. R to NHBS's 56(a)1 Stmt.)

Similarly, in 2011, the CT DOL concluded that NHBS had properly claimed the motor carrier exemption between July 2008 and July 2010. (2011 Audit Report, Ex. S to NHBS's 56(a)1 Stmt.) That same year, the CT DOL investigated a complaint by Plaintiff Porcenat and concluded that he was exempt from overtime for the period of July 2009 to July 2011 pursuant to the motor carrier exemption. (Porcenat Investigation Ltr., Ex. U to NHBS's 56(a)1 Stmt.; Porcenat Audit Report, Ex. W to NHBS's 56(a)1 Stmt.) On September 1, 2011, the CT DOL sent a letter to all NHBS drivers explaining that they were exempt from overtime wages pursuant to the motor carrier exemption. (Sept. 1, 2011 Ltr., Ex. T to NHBS's 56(a)1 Stmt.)

### B.     Yale University

Yale University's primary focus is providing educational services to its students. (Relihan Aff., Ex. 1 to Yale's 56(a)1 Stmt. ¶ 11.) At all times relevant to this action, Yale had a contractual relationship with NHBS pursuant to which NHBS provided shuttle bus service to the university. (*Id.* ¶ 2.) Yale advertised its shuttle service, which included several regular routes and a special services van for disabled members of the Yale community, as a convenience and a feature that improved safety on and around campus. (Yale Public Safety Brochure, Ex. 9 to Pls.' Yale Loc. R. 56(a)2 Stmt. [Doc. # 80]; Yale Website, Ex. 10 to Pls.' Yale 56(a)2 Stmt.; Yale Parking & Transportation Bulletin, Ex. 11 to Pls.' Yale 56(a)2 Stmt.; Yale Transit Website, Ex. 12 to Pls.' Yale 56(a)2 Stmt.) Under its contract with NHBS, Yale lacked the authority to hire, fire, or discipline NHBS's

employees. (Relihan Aff. ¶ 3.) Yale did not participate in the hiring process for shuttle bus drivers and had no involvement in determining NHBS's driver requirements—such as the requirement that all drivers possess a valid CDL and undergo drug screening. (*Id.*) Yale did not determine the method or rate of payment for any of NHBS's employees and did not pay any individuals employed by NHBS. (*Id.* ¶ 6.) Yale did not maintain any "employment records, personnel files, time sheets, pay stubs, or government employment forms" for NHBS's employees. (*Id.* ¶ 7.)

While Yale owned some of the vehicles driven by NHBS drivers on the shuttle routes, NHBS also owned and supplied some of the shuttle vehicles, and all of the shuttle vehicles, including those owned by Yale, were housed on premises owned by NHBS. (*Id.* ¶¶ 8–9.) NHBS's employees were not a part of a business organization that shifted as a unit from one company to another and Yale did not require that NHBS or its drivers work exclusively for Yale. (*Id.* ¶ 10.) Yale set the routes for the shuttle service, but did not determine which drivers drove which routes on which days and did not monitor the hours worked by the individuals employed by NHBS. (*Id.* ¶ 4.) On June 30, 2011, Yale ended its contract with NHBS and entered into a contract with First Transit to run the university's shuttle service. (*Id.* ¶ 12.) When First Transit took over the shuttle service contract, it hired approximately two-thirds of the NHBS drivers who had driven the shuttle routes, but Yale did not mandate that these drivers be hired and was not involved in First Transit's hiring process. (*Id.*)

**C.    Zacharie Porcenat**

Plaintiff Porcenat was employed by NHBS from mid-2008 through June 30, 2011 as a Yale door-to-door shuttle driver. (Porcenat Aff., Ex. 7 to Pls.' NHBS Loc. R. 56(a)2 Stmt. [Doc. # 76] ¶ 3.) During this time, Porcenat worked more than forty hours per

6

week, but was not paid overtime wages.  (*Id.* ¶ 15.)  Porcenat typically worked Monday through Friday from 6:00pm to 1:00am, but also worked additional hours and days at his employer's request.  (*Id.* ¶ 4.)  NHBS never provided Porcenat with a copy of the Federal Motor Carrier Safety Regulations or the Driver Employment & Conduct Manual at any time during his employment, and when he was hired Porcenat was told that he would only be required to drive in New Haven.  (*Id.* ¶¶ 6–8.)  During his employment, Porcenat never travelled out of state.  (*Id.* ¶ 9.)  The vans that Porcenat drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services."  (*Id.* ¶¶ 10–11.)  As a door-to-door van driver, Porcenat's pick-ups and drop-offs were relayed to him by a Yale dispatcher, and later by a Yale-owned GPS and computer dispatching system, on which a Yale employee had trained him.  (*Id.* ¶¶ 12–14.)  Porcenat was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption.  (*Id.* ¶ 16.)

### D.  Jaime Garcia

Plaintiff Garcia was employed by NHBS from April 2008 through June 30, 2011. (Garcia Aff., Ex. 5 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.)  During this time, Garcia worked more than forty hours per week, but was not paid overtime wages.  (*Id.* ¶ 20.)  In his six months' of employment, Garcia drove a special services handicapped van for Yale Monday through Friday from 6:30am and 1:00pm, and then drove a Yale shuttle between the Yale Medical School and the Veterans Administration hospital (the "VA shuttle") from 1:30pm to 7:30pm.  (*Id.* ¶¶ 5–6.)  As a special services van driver, Garcia was occasionally dispatched to the New Haven train station, but never drove to any destinations outside New Haven.  (*Id.* ¶ 19.)  In 2009 and 2010, Garcia drove the special

services van exclusively from 6:30am to 6:15pm. (*Id.* ¶ 7.) In 2011, he drove the same van between 6:30am and 2:30pm. (*Id.* ¶ 8.) After NHBS's contract with Yale ended, Garcia was hired by First Transit to drive the same route during the same hours. (*Id.* ¶ 9.)

When he was hired, Garcia was not told that he would be expected to drive out of state, and in 2009, Defendant Miley provided Garcia with an employment verification letter indicating that he had been hired to operate a special services bus for Yale. (*Id.* ¶ 22; Employment Verification Letter, Ex. 1 to Garcia Aff.) During his employment, Garcia drove in-state charter assignments, but never travelled out of state. (*Id.* ¶¶ 17–18.) The vans that Garcia drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services." (*Id.* ¶¶ 10–11.) As a special services van driver, Garcia's pick-ups and drop-offs were relayed to him by a Yale dispatcher, and later by a Yale-owned GPS and computer dispatching system, on which a Yale employee had trained him. (Garcia Aff. ¶¶ 12–15.) Garcia was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption. (*Id.* ¶ 21.)

### E.    James Earl Ebron

Plaintiff Ebron was employed by NHBS from 2007 through June 30, 2011. (Ebron Aff., Ex. 4 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.) During this time, Ebron worked more than forty hours per week, but was not paid overtime wages. (*Id.* ¶ 15.) In his first year of employment, Ebron worked four nights per week as a Yale door-to-door shuttle driver, and beginning in 2008, he worked Monday through Friday 12:30pm to 7:30pm as a Yale shuttle driver on the Red shuttle line in New Haven. (*Id.* ¶¶ 4–5.) Ebron also worked Monday through Friday from 5:00am to 8:00am bringing construction crews from a parking lot to a Yale construction site. (*Id.* ¶ 6.) NHBS never provided Ebron with a

copy of the Federal Motor Carrier Safety Regulations or the Driver Employment & Conduct Manual at any time during his employment, and when he was hired Ebron was not told that he would be expected to drive out of state.  (*Id.* ¶¶ 7–9.)  During his employment, Ebron drove several in-state charter assignments, but never travelled out of state.  (*Id.* ¶¶ 10–12.)  The buses and vans that Ebron drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services."  (*Id.* ¶¶ 13–14.)  Ebron was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption.  (*Id.* ¶ 16.)

**F.    Matias Cabrera**

Plaintiff Cabrera was employed by NHBS from 2004 through June 30, 2011 and regularly worked Monday through Friday from 6:00am to 7:00pm as a Yale shuttle driver on the Red and Blue shuttle lines in New Haven.  (Cabrera Aff., Ex. 2 to Pls.' NHBS 56(a)2 Stmt. ¶¶ 3–4.)  During this time, Cabrera worked more than forty hours per week, but was not paid overtime wages.  (*Id.* ¶ 12.)  NHBS never provided Cabrera with a copy of the Federal Motor Carrier Safety Regulations at any time during his employment, and when he was hired Cabrera was not told that he would be expected to drive out of state. (*Id.* ¶¶ 4–5.)  Although Cabrera might have driven out of state on one or more occasions for Yale charters, during the last eighteen months of his employment, Cabrera was not given any out-of-state assignments.  (*Id.* ¶ 7.)   Cabrera did drive several charter assignments during that period, but they were all within Connecticut.  (*Id.* ¶ 8.)  The buses that Cabrera drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services."  (*Id.* ¶¶ 9–10.)  When he worked past 6:00pm on Yale shuttle routes, he worked

under the supervision of a Yale dispatcher. (*Id.* ¶ 11.)  Cabrera was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption. (*Id.* ¶ 13.)

> **G.   David Pearson**

Plaintiff Pearson was employed by NHBS from 2001 through 2005, and from 2008 through June 30, 2011. (Pearson Aff., Ex. 6 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.)  During this time, Pearson worked more than forty hours per week, but was not paid overtime wages. (*Id.* ¶ 15.)  From 2008 to 2010, Pearson drove the Yale VA shuttle between 1:30pm and 7:00pm, and in 2011, Pearson drove the Purple shuttle line for Yale, which did not include any stops at the train station or airport in New Haven. (*Id.* ¶¶ 4–5.)  NHBS never provided Pearson with a copy of the Federal Motor Carrier Safety Regulations or the Driver Employment & Conduct Manual at any time during his employment, and when he was hired Pearson was not told that he would be expected to drive out of state. (*Id.* ¶¶ 7–8.)  During his employment, Pearson drove several in-state charter assignments, which assignments he understood he was free to turn down, but he never travelled out of state. (*Id.* ¶¶ 9–11.)  After 2004, Pearson observed that NHBS had sold all of the coach buses it typically used to drive out-of-state charters, and during his entire tenure at NHBS, he was aware of only two drivers who drove out-of-state charters for the company, none of whom are plaintiffs in this action. (*Id.* ¶ 17.) The buses that Pearson drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services." (*Id.* ¶¶ 12–13.)  As a Yale shuttle driver, Pearson worked under the direction of both Yale and NHBS dispatchers. (*Id.* ¶ 14.)  Pearson was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption. (*Id.* ¶ 16.)

### H.     Luis Alicea

Plaintiff Alicea was employed by NHBS from 1985 until mid-2008 and from mid-2009 through June 2011.  (Alicea Aff., Ex. 1 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.)  During this time Alicea worked more than forty hours per week put was never paid overtime wages. (*Id.* ¶ 19.)  Beginning in 2009, Alicea worked Monday through Friday from 5:30pm to 1:00am and Sunday from 5:30pm to 2:00am on Yale's door-to-door shuttle, which ran within New Haven, Connecticut.  (*Id.* ¶¶ 4–5.)  The vans that Plaintiff Alicea drove were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services."  (*Id.* ¶¶ 6–7.)  The vans had a GPS and computer dispatching system that provided all pick-up and drop-off information to the drivers.  (*Id.* ¶ 8.)  Yale owned this system, Alicea was trained to use the system by a Yale employee, and all of his dispatches came from Yale.  (*Id.* ¶¶ 9–10.)

When he was hired by NHBS, Alicea was not informed that he needed to be able to drive to out-of-state destinations, and during his entire employment, he only drove out of state on one occasion—a May 20, 2011 trip to a hotel near John F. Kennedy Airport in New York City.  (*Id.* ¶¶ 12–13.)  Alicea was asked to drive charters within Connecticut on other occasions but understood pursuant to company policy that he was free to refuse these requests.  (*Id.* ¶¶ 14–17.)  Alicea's work as a door-to-door shuttle driver occasionally required him to drive to the train station in New Haven, but never to the airports in Connecticut.  (*Id.* ¶ 18.)  After 2004, Alicea observed that NHBS had sold all of the coach buses it typically used to drive out-of-state charters, and during his entire tenure at NHBS, he was aware of only four drivers who drove out-of-state charters for the company, none of whom are plaintiffs in this action.  (*Id.* ¶ 21.)  Alicea was never

interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption.  (*Id.* ¶ 20.)

>        **I.      Kenneth Thomas**

Plaintiff Thomas was employed by NHBS from 2000 through June 30, 2011. (Thomas Aff., Ex. 8 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.)  During this time, Thomas worked more than forty hours per week, but was not paid overtime wages.  (*Id.* ¶ 14.)  Thomas regularly worked as a Yale door-to-door shuttle driver between 12:00am and 8:00am, except for a period of two or three years when he drove the Yale VA shuttle from 12:00pm to 7:30pm.  (*Id.* ¶¶ 3–5.)  NHBS never provided Thomas with a copy of the Driver Employment & Conduct Manual at any time during his employment, and when he was hired, Thomas was not told that he would be expected to drive out of state.  (*Id.* ¶¶ 6–7.)  Thomas occasionally drove in-state charter assignments, but never drove out-of-state during his employment with NHBS.  (*Id.* ¶¶ 8–9.)  The vans that Thomas drove on his door-to-door shuttle route were owned by Yale, and his pick-ups and drop-offs were relayed to him by a Yale dispatcher, and later by a Yale-owned GPS and computer dispatching system, on which a Yale employee had trained him.  (*Id.* ¶¶ 10–13.) Thomas was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption.  (*Id.* ¶ 15.)

>        **J.      Dwayne Clark**

Plaintiff Clark was employed by NHBS from 2009 through June 30, 2011 and he regularly worked Monday through Friday from 7:00am to 6:00pm as a Yale shuttle driver on the Blue shuttle line in New Haven.  (Clark Aff., Ex. 3 to Pls.' NHBS 56(a)2 Stmt. ¶ 3.) During this time, Clark worked more than forty hours per week, but was not paid overtime wages.  (*Id.* ¶ 14.)  NHBS never provided Clark with a copy of the Federal Motor

Carrier Safety Regulations or the Driver Employment & Conduct Manual at any time during his employment, and when he was hired Clark was not told that he would be expected to drive out of state.  (*Id.* ¶¶ 4–6.)  In 2010, Clark took two out-of-state charter trips to New York.  (*Id.* ¶ 7.)  During his employment, Clark also drove several in-state charters, but understood that he was free to refuse any charter assignment he did not wish to take.  (*Id.* ¶¶ 8–10.)  The buses that Clark drove on his shuttle routes were owned by Yale, and his uniform included a patch with the Yale bulldog and the words "Yale University Parking & Transit Services."  (*Id.* ¶¶ 11–12.)  When he worked extra shifts or charter assignments for Yale, Clark worked under the supervision of a Yale dispatcher.  (*Id.* ¶ 13.)   Clark was never interviewed in connection with the US DOL or CT DOL investigations into NHBS's use of the motor carrier exemption.  (*Id.* ¶ 15.)

## II.    Discussion[4]

Yale moves for summary judgment on the grounds that it cannot be considered Plaintiffs' joint employer for the purposes of the FLSA or the CMWA, and thus cannot be held liable for any violation of those statutes.  Yale further argues that even if it were Plaintiffs' joint employer, Plaintiffs would be exempt from federal and state overtime

---

[4] "Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

requirements pursuant to the motor carrier exemption, and that the majority of Plaintiffs' claims are barred by the statute of limitations.[5]

Yale argues that it did not employ Plaintiffs within the meaning of the FLSA or the CMWA,[6] and that therefore it is not liable for the alleged overtime violations in this case.  The FLSA controls certain terms of the relationship between "employers"[7] and "employees."[8]  29 U.S.C. § 207.  Where a plaintiff claims multiple simultaneous employers, or "joint employers" under the FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question . . . with an eye to the economic reality presented by the facts of each case."  *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal citations and quotation marks omitted).  In applying the economic reality test, a court must first evaluate whether the alleged joint employer exercised formal control over a plaintiff's employment.  The Second Circuit has recognized a four-factor joint-employer test to establish formal control, which asks whether an employer:  (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir.

---

[5] Because the Court concludes as a matter of law that Yale was not Plaintiffs' joint employer, it need not reach the issue of the motor carrier exemption or the applicable statute of limitations.

[6] At oral argument, counsel for Plaintiffs conceded that Yale did not satisfy the joint–employer test under Connecticut law and thus Plaintiffs are pursuing only their FLSA claim in Count One against Yale.

[7] FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).

[8] FLSA provides that "the term 'employee' means any individual employed by an employer."  29 U.S.C. § 203(e)(1).

1984).  Plaintiffs concede that none of the *Carter* factors are met with respect to their claims against Yale.

However, "*Carter* did not hold . . . that those [four] factors are *necessary* to establish an employment relationship."  *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir.2003) (emphasis in original).  A court may also consider the following factors to determine whether a defendant had functional control over a plaintiff's employment:

> (1) whether [the putative employer's] premises and equipment were used for the plaintiffs' work; (2) whether [the direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative employer's] process of production; (4) whether responsibility under the contracts [between the direct and putative employers] could pass from one [entity] to another without material changes; (5) the degree to which the [putative employers or its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominately for the [putative employer].

*Id.* at 72.  The Second Circuit has not announced a definitive set of factors to establish functional control, recognizing that there will be "different sets of relevant factors based on the factual challenges posed by particular cases."  *Barfield v. New York City Health and Hospitals*, 537 F.3d 132, 142–43 (2d Cir. 2008) (holding that previous precedent "state[s] no rigid rule for the identification of an FLSA employer . . . [but] provide[s] a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA").

Yale argues that it did not exercise functional control over Plaintiffs under the *Zheng* factors, and that it cannot be considered a joint employer under that test either. With respect to the first *Zheng* factor—whether the putative joint employer's premises and equipment were used for the plaintiffs' work—Yale argues that this factor weighs

against a conclusion that it employed Plaintiffs because although Yale owned some of the shuttle vehicles and NHBS owned others, all of the shuttle vehicles were stored at NHBS's facilities, and each driver commenced and ended his or her shift at NHBS's facilities. Plaintiffs dispute that NHBS owned some of the shuttle vehicles, citing their individual affidavits in which they assert that they drove only Yale-owned vehicles when on shuttle routes. However, the fact that Plaintiffs always drove Yale-owned vehicles does not call into question Yale's and NHBS's assertions that a portion of the shuttle fleet was owned by NHBS. Plaintiffs also cite the fact that they wore Yale insignia on their uniforms, and used a Yale-owned GPS dispatch system for the proposition that the first *Zheng* factor supports a finding of an employment relationship between Plaintiffs and Yale. Based on the record before the Court, it appears that Plaintiffs used both Yale and NHBS premises and equipment in the course of their employment. Yale and NHBS both owned a portion of the shuttle fleet. NHBS stored the vehicles and managed the shuttle service from its own property, but Plaintiffs used Yale-owned dispatching systems to navigate their routes, which covered the Yale campus and other areas in New Haven. Therefore, this factor neither weighs for nor against a finding that Yale was a joint employer.

With respect to the second *Zheng* factor, Plaintiffs do not dispute that NHBS did not have a discrete business unit that shifted from one joint employer to another. Plaintiffs do argue that because NHBS drew a significant portion of its revenues from its contract with Yale, this factor should not weigh heavily in favor of Yale. However, whether Plaintiffs did the majority of their work for Yale is considered under a different factor of the *Zheng* test, and thus the second factor weighs against a finding that Yale is a joint employer.

Plaintiffs argue that the third *Zheng* factor weighs in their favor because Yale has touted its shuttle service as a major safety initiative, and claim that their work is thus integral to Yale's operations.  Yale argues that its primary focus is providing educational services, and that its ability to provide those services would be unchanged if its shuttle service ceased to operate.  Although Plaintiffs have cited to Yale's website and safety brochures as evidence that there is a factual dispute as to whether the shuttle service is integral to Yale's operations, these materials cannot call into question Yale's assertion that its primary focus is on education.  Yale is a clearly primarily an institute of higher education and not a provider of transportation.  Although the shuttle service may make Yale a more attractive place to work and study, Yale would not cease operations if the shuttle service went defunct.  Thus, Yale's shuttle service is not integral to its larger mission of educating its students.  Therefore, the third factor weighs against a finding that Yale is a joint employer.

With respect to the fourth *Zheng* factor—whether responsibility for the shuttle service contract could pass from one contractor to another without material changes— Plaintiffs argue that this factor weighs in their favor because First Transit hired approximately two-thirds of NHBS's employees, including Plaintiff Garcia, when it took over the contract from NHBS.  However, Yale argues that it played no role in First Transit's decision to hire those employees, and thus this factor does not weigh against it. First Transit did eventually hire the majority of NHBS's employees, and Plaintiff Garcia has stated that his duties, the vehicles he drove, and his hours of work did not change under his new employer.   However, First Transit also chose not to hire one-third of NHBS's employees, including the majority of the plaintiffs in this action, and those individuals are no longer Yale shuttle bus drivers as a result of the change in contractors.

The Second Circuit has explained that "where . . . employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." *Zheng*, 355 F.3d at 74.  Thus, for the majority of the plaintiffs, they could only be said to have worked for Yale to the extent that NHBS had a contract with Yale, and once that contract ended, their involvement with Yale also terminated. Furthermore, Plaintiffs have offered no evidence to counter Yale's contention that it played no role in First Transit's decision to hire the former NHBS employees, and that the continued employment of these individuals as shuttle drivers was not a requirement of First Transit's contract with Yale.  Therefore, this factor does not weigh in Plaintiffs' favor

With respect to the fifth *Zheng* factor, the parties are in dispute as to the extent of Yale's supervision over Plaintiffs.  Plaintiffs argue that they reported to Yale dispatchers and were trained by Yale employees to use Yale equipment on Yale vehicles when carrying out their duties.  However, Plaintiffs do not dispute that Yale had no authority to discipline them, and they have not offered evidence to contradict Yale's contention that it played no role in determining which individuals drove which route at what time.  Yale argues that the fact that Yale dispatcher's monitored some of the drivers during their shifts amount to nothing more than "supervision with respect to contractual warranties of quality and time of delivery," which the Second Circuit explained has no bearing on the joint employment inquiry.  *Zheng*, 355 F.3d at 75.  However, the exact nature of the Yale dispatchers' role in supervising Plaintiffs is not clear based on the present record. Recognized that Plaintiffs bear the burden of proof, but drawing all inferences in their favor, Yale did exercise some authority over Plaintiffs in their day-to-day performance, and thus this factor weighs in Plaintiffs' favor.

Finally, with respect to the sixth *Zheng* factor, it is undisputed that the majority of NHBS's business came from the Yale contract, and that the individual plaintiffs themselves worked almost exclusively for Yale. Thus, this factor also weighs in Plaintiffs' favor.

Yale argues that Plaintiffs in this case are similar to the plaintiffs in *Jean-Louis v. Metro. Cable Communs., Inc.*, 838 F. Supp. 2d 111 (S.D.N.Y. 2011), whose joint employer claims ultimately failed. There, the plaintiffs were cable installers who worked for a subcontractor of Time Warner. The court determined that the sole *Zheng* factor that weighed in the plaintiffs' favor was that they worked exclusively for Time Warner, and that this factor alone was insufficient as a matter of law to render Time Warner the plaintiffs' joint employer within the meaning of the FLSA. Here, there is slightly more evidence in favor of a finding of joint employment. Plaintiffs do use more of Yale's equipment than the *Jean-Louis* plaintiffs did, and Yale may have exercised slightly more supervisory authority over Plaintiffs than Time Warner exercised over its subcontractors' cable installers.

Nonetheless, even when resolving all factual disputes in favor of Plaintiffs and drawing all reasonable inferences in their favor, an analysis of the relevant factors indicates as a matter of law that Yale did not employ Plaintiffs within the meaning of the FLSA. Although two of the factors weigh in Plaintiffs' favor, a court need not determine that every factor weighs in favor of the defendant in order to hold as a matter of law that no joint employer relationship existed. *Id.* at 136. Plaintiffs reported to NHBS's premises for work every day, their individual work schedules were set by NHBS, Yale lacked authority to discipline Plaintiffs, and when NHBS's contract with Yale ended, the

19

majority of the plaintiffs ceased to work as Yale shuttle drivers.  Therefore, the Court concludes that Yale was not Plaintiffs' joint employer within the meaning of the FLSA.

**III.**    **Conclusion**

Based on the foregoing, Defendant Yale University's Motion [Doc. # 56] for Summary Judgment is GRANTED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of August, 2014.